UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

EVAN STEIN, M.D., Ph.D.,

        Plaintiff,                             Case No. 1:12-cv-605

    vs.

                                       Magistrate Judge Bowman

MARY MCGOWAN, M.D.,

        Defendants.

**MEMORANDUM OPINION**

This action is now before the Court on Defendant's motion for summary judgment (Doc. 17) and the parties' responsive memoranda, including Defendant's proposed undisputed facts and Plaintiff's response thereto.  (Docs. 46, 48).  The parties have consented to the exercise of jurisdiction by the Magistrate Judge pursuant to 28 U.S.C. § 636(c).  (*See* Doc. 6).  The parties appeared for oral argument before the undersigned on October 1, 2014.  For the reasons set forth herein, the undersigned finds that Defendant's motion for summary judgment is not well-taken.

    **I.    Background and Facts**

After completing his M.D. and Ph.D. abroad, Plaintiff Evan Stein, joined the University of Cincinnati as a full-time faculty member and achieved the rank of Professor of Pathology and Laboratory Medicine as well as Associate Professor of Internal Medicine. (Stein 9/21/2012 dep. at 28-29). During his eleven years on the faculty, Dr. Stein also formed the Cholesterol Treatment Center ("CTC"), a clinic where he could treat private patients suffering from lipid disorders. (*Id.* at 30-31, 34).

In or about 1987, Dr. Stein separated from the University and formed a company called Medical Research Laboratories, which provided services to the pharmaceutical industry for clinical trials. (*Id.* at 31). He also maintained the CTC, which steadily grew into a large private practice.  In 2002, Dr. Stein sold Medical Research Laboratories but stayed on for an additional three years to manage the laboratory. (*Id.* at 32).

In or about 2005, Dr. Stein formed the Metabolic and Atherosclerosis Research Center ("MARC"), a laboratory specializing in clinical trials affecting lipid metabolism. In 2008, MARC was acquired by Medpace, a contract research organization serving the pharmaceuticals industry. (*Id.* at 41).  Medpace named Dr. Stein Chief Scientific Officer, appointed him to the Board of Directors, and made him a minority shareholder. (*Id.* at 11.). Dr. Stein also maintained his position as Director of MARC and continued his private practice at CTC, which was not acquired by Medpace. (Stein 9/21/12 dep. at 41-42).

When MARC became a subsidiary of Medpace, both MARC and CTC were relocated to a Medpace building in Norwood. (Stein 9/21/12 dep. at 34-35). Although the two entities were separate, they shared the same clinical space. (*Id.* at 40). In terms of personnel, Dr. Stein performed services for both entities, as did Dr. Cheryle Webb, a physician who participated in both the clinical trials and saw private patients. (Webb 4/24/13 dep. at 6-10). MARC and CTC also shared several medical assistants. (Stein 9/21/12 dep. at 40). The study coordinators, however, had duties solely related to the clinical trials that took place at MARC. (Bussell 5/9/14 dep. at 10-11; Dimova 4/3/13 dep. at 22-23; Dimova 5/9/14 dep. at 11).

During his tenure at Medpace, Dr. Stein began looking for a physician who would be able to take over his responsibilities at both MARC and CTC so that he could retire. (Stein 9/21/12 dep. at 44). In furtherance of that goal, Dr. Stein sent an email to a number of his colleagues, including Defendant Mary McGowan, M.D., containing a job description. Dr. McGowan responded that she did not know anyone, but that she herself may be interested. (*Id.* at 48).

Dr. McGowan is a highly-regarded expert in lipid (i.e., cholesterol) metabolism. (McGowan 5/23/12 Dep. at 30; Troendle Dep. Ex. 41; Troendle Dep. at 8-9). She completed a fellowship in that field at John Hopkins and continued that work for 20 years. (McGowan 5/23/12 Dep. at 30). She is board certified by the National Lipid Association and was the Medical Director at Concord Hospital's cholesterol treatment center for six years, and the director of the Cholesterol Management Center at Catholic Medical Center for 13 years. (McGowan 5/23/12 Dep. at 30; McGowan 5/23/12 Dep. Ex. 3).

*Dr. McGowan is hired by Medpace.*

On December 26, 2010, Medpace offered Dr. McGowan a full-time position as the Executive Director of Medpace Clinics. (McGowan 5/23/12 dep. at 23; McGowan 5/23/12 dep. at Ex. 2). In that capacity, Dr. McGowan would be charged with directing Medpace's Clinical Pharmacology Unit ("CPU") and MARC, as well as taking over Dr. Stein's private practice at CTC. (*Id.* at 23-24). Dr. McGowan began work on May 9, 2011. (McGowan 6/11/14 dep. at 62).

Dr. McGowan assumed treatment of Dr. Stein's patients at the CTC. Patients from the CTC were routinely referred by Dr. Stein to clinical trials at MARC. (McGowan

5/23/12 Dep. at 44-45; see also, Troendle Dep. at 13; Stein 9/21/12 Dep. at 84, 86). MARC staff treated and dispensed medicine to these patients. (McGowan 5/23/12 Dep. at 44-45; *see also*, Troendle Dep. at 13; Stein 9/21/12 Dep. at 84, 86).

Soon after starting at Medpace, Dr. McGowan discovered what she perceived as serious issues in the CTC and MARC (which shared the same small staff). (*See* McGowan 5/23/12 Dep. at 8-14; see also, Chavarria Dep. at 8, 10). When Dr. McGowan started at MARC and the CTC in mid-2011, she contends that staff members asked her to write prescriptions for twice, or even quadruple, patients' daily dosages which would allow the patient to take one-half or one-quarter of a pill and receive twice or four times the amount of medicine for a single co-payment. (McGowan 6/11/14 Dep. at 62; McGowan 5/23/12 Dep. at 9, 10, 48-49; Kranz Dep. at 16, 17; Troendle Dep. at 64, 65; Chavarria Dep. at 21; Dimova 4/3/13 Dep. at 18-19, 20; Payne Dep. at 18).

She had also been repeatedly asked to refill prescriptions which Dr. Stein had originally written in the same manner. (Aff. of Mary McGowan in companion case at ¶ 2, attached as Pl. Ex. A; see also Stein 9/21/12 Dep. at 110; Chavarria Dep. at 13). According to McGowan, Dr. Stein had been writing these double or quadruple prescriptions and recording in the patient's chart a different dose than he had prescribed. (McGowan 6/11/14 Dep. at 126-127).

According to Dr. McGowan, it was not necessarily the instruction to split the pill that was the problem; it was Dr. Stein's practice of writing a different dose in the chart than had been prescribed, with the purpose of saving the patient a co-payment, which concerned Dr. McGowan. (McGowan 6/11/14 Dep. at 126-127, 146). She understood this to constitute insurance fraud and also believed it presented a patient safety issue.

4

(McGowan 5/23/12 Dep. at 48-49).  Dr. McGowan also witnessed what she believed to be HIPAA violations, including exposure of patients' records as their charts were left open on a table outside patients' rooms. She also perceived a problem with the patient's private CTC charts being contained within the clinical trial chart.  (McGowan 5/23/12 Dep. at 10-11; see also, Ernst Dep. at 24-25, 26; McGowan 6/11/14 Dep. at 33-34, 47).

Dr. Stein denies that he engaged in any fraudulent practices.  Dr. Stein wrote prescriptions for cholesterol medication and orally directed his patients to split those tablets in half. (Affidavit of Dr. Cheryl Webb at ¶¶ 6-8).  Dr. Stein denies that his prescription practice or instructions to his patients were in any way improper. (Stein 9/21/12 dep. at 97-99; Webb 6/6/14 dep. at 19; Dimova 5/9/14 dep. at 12; Webb Aff. at ¶¶ 6-8).

 Dr. Stein denies that the practice of combining charts violated HIPAA.  Notably, MARC was subject to numerous audits by federal regulatory agencies and pharmaceutical companies, neither of which ever found any problem with the manner in which his charts were maintained. (Bussell dep. 5/9/14 dep. at 15; Richter 5/2/14 dep. at 34, 37-38). Moreover, Dr. Stein required each of his CTC patients who participated in a MARC study to execute an informed consent form acknowledging that their personal medical information may be used in the study. (*Id.* at 3).

*July 2011 Meeting*

On July 22, 2011, Dr. McGowan met with the members of the MARC/CTC staff (including Dessy Dimova, Senior Study Coordinator; Lindy Bussell, Study Coordinator; Terese Kranz, Study Coordinator; Melissa Payne, General Assistant in MARC/CTC, and Denise Chavarria, MARC/CTC Research Assistant) to explain her concerns about

5

alleged HIPAA violations, and direct them to separate patient charts and to remove irrelevant information from the cholesterol study charts. (Kranz Dep. at 9, 17-18, 19; Payne Dep. at 19; Dimova 4/3/13 Dep. at 16-17; McGowan 5/23/12 Dep. at 12-13; Bussell 6/13/13 Dep. at 7-8, 24; Chavarria Dep. at 17, 19, 20, 24; Ernst Dep. at 20-21, 26-27; see also Stein 4/30/14 Dep. at 30). Several of these staff members were responsible for obtaining Dr. McGowan's signature on prescriptions, preparing the forms and calling prescriptions in. (McGowan 6/11/14 Dep. at 106-107). Dr. McGowan also explained to the MARC staff that she had issues with Dr. Stein's prescription practices and that she believed such practices posed a threat to patient safety and was also insurance fraud. (Kranz Dep. at 16, 17; Troendle Dep. at 64, 65; Chavarria Dep. at 21; Dimova 4/3/13 Dep. at 18-19, 20).

During the meeting, Dr. McGowan informed the staff that Dr. Stein had routinely engaged in insurance fraud with respect to his prescription practices at CTC. Specifically, she claimed that by prescribing a higher dose of statins so that the pill could be cut in half, Dr. Stein was engaging in illegal, unethical, and fraudulent behavior. (Dimova 5/9/14 dep,. at 8-9; Bussell 5/9/14 dep. at 9; Chavarria dep. at 20). She further stated that the manner in which Dr. Stein's charts were stored at CTC were illegal in that they violated HIPAA. (Dimova 5/9/14 dep. at 8; Bussell dep. at 9-10).

According to Dr. McGowan, she was careful to preface her concerns about Dr. Stein's prescription practices by telling staff that she believed Dr. Stein was a very smart doctor who truly cared about his patients and she had no intent to make the staff view Dr. Stein in a negative manner. (McGowan 6/11/14 Dep. at 122-123; McGowan 5/23/12 Dep. at 53.) Dr. McGowan asserts that her only goal was to take over Dr. Stein's

practice (as she had been hired to do) and run it consistently with the law and patient safety. (McGowan 6/11/14 Dep. at 51). Dr. McGowan also maintains that she had no intention to injure Dr. Stein professionally. (McGowan 6/11/14 Dept. at 75, 97).

Dr. McGowan asserts that no staff members made any comments or asked any questions at the meeting. (Payne Dep. at 19; Chavarria Dep. at 21). According to McGowan, it was clear to multiple staff members that she was only trying to ensure that staff understood that she was changing the way prescriptions were handled so that the prescription matched the patient chart, which was her responsibility. (Chavarria Dep. at 20-21; Payne Dep. at 20-21; see also, Khodadad Dep. at 30, 41). However, none of the staff present at the meeting recall any statements by Dr. McGowan related to her motivation for notifying the staff of Dr. Stein's alleged fraudulent practices. (Dimova 5/9/14 dep. at 8-10; Bussell 5/9/14 dep. at 10-11; Kranz dep. at 17; Payne dep. at 18; Chavarria dep. at 20).

Furthermore, Dr. Stein contends that staff members did express concerns during the meeting. Notably, Ms. Dimova stated during the meeting that MARC employees should not be listening to complaints about the private office, as the research clinic has nothing to do with any of the prescription issues. (Dimova 4/3/13 dep. at 22-23; Dimova 5/9/14 dep. at 11). Dimova also informed Dr. McGowan that she was shocked by her statements. (Dimova 5/9/14 dep. at 10). Ms. Bussell stated during the meeting that she did not want to be involved because her job did not have anything to do with CTC. (Bussell 5/9/14 dep. at 10-11). She also told Dr. McGowan that she found it very hard to believe that Dr. Stein would do anything unethical in regards to the charts. (Bussell 5/9/14 dep. at 14).

Dimova and Bussell both told Dr. Stein what Dr. McGowan had communicated during their staff meeting. (Stein 4/30/14 Dep. at 14, 16, 30).  Dr. Stein replied to Bussell's email informing him about Dr. McGowan's change in prescription policy stating that Dr. McGowan had "put an end to her association with [him] and [his] clinical operations in CTC and MARC" and closed his email by sniping that it was "hard to understand" Dr. McGowan's "motives when [she had] been given an opportunity of [her] lifetime to move from a small backwaters of a lipid clinic." (McGowan 5/23/12 Dep. at 94; McGowan 5/23/12 Dep. Ex. 11).

 Dr. McGowan also had some concerns about whether Dr. Stein's practices violated anti-kickback statutes (aka Stark laws) but she saw no need to raise these concerns with staff and did not mention them at the meeting. (McGowan 6/11/14 Dep. at 76-78). She did, however, raise them with Ms. Khodadad from Human Resources and legal counsel and the CEO. (McGowan 6/11/14 Dep. at 78-79). According to Dr. Stein, Dr. McGowan also expressed concern to Lee Ann Ernst, a nurse coordinator, that Dr. Stein was violating Stark laws. (Ernst dep. at 20).

Consistent with Medpace's directives for reporting suspected violations, Dr. McGowan met with Medpace's legal counsel Kay Nolen, Ms. Khodadad from HR, and Medpace CEO Dr. Troendle on July 27, 2011, after she sent an email asking for an immediate meeting to deal with the prescription issue. (McGowan 5/23/12 Dep. at 49-50, 57, 60, 103-104; McGowan 5/23/12 Dep. Ex. 13; Troendle Dep. at 59, 97; Khodadad Dep. at 22.)  Dr. McGowan explained her concern that Dr. Stein had written one thing in a patient's chart and given out a different prescription, which created a patient safety issue. (McGowan 5/23/12 Dep. Ex. 41; Troendle Dep. at 66; McGowan

5/23/12 Dep. at 59-60). Dr. Troendle gave his opinion that writing prescriptions in the manner described to him by Dr. McGowan was not best practice and that Dr. Troendle suggested she should not do so if she was not comfortable with it. (Troendle dep. at 66-68).

According to Dr. McGowan, she had learned that pill splitting presented issues of fraud and patient safety through her professional education and she confirmed that understanding with Jim Whittington, M.D. at the Ohio Board of Pharmacy. (Id. at 50-51; McGowan 6/11/14 Dep. at 15-16, 30-31). He also cited her to the relevant Ohio statute, R.C. 2913.47.

At some point near the end of July, Dr. McGowan contacted her nephew, Joe Bonocore, the CFO for JP Morgan Chase, about her concerns relating to Dr. Steins' alleged fraudulent practices and HIPPA violations. (McGowan 6/11/14 Dep. at 84-85, 86). The company he worked for, JP Morgan Chase, owned a company which in turn owned a majority share of Medpace. (McGowan 6/11/14 Dep. at 85-85, 86). According to McGowan, she hoped her nephew could "help salvage her job." (Id. at 90). On August 17, 2011, Dr. Troendle asked Dr. McGowan to stay after a staff meeting to tell her again that she needed to apologize to Dr. Stein; Dr. McGowan repeated her concern that Dr. Stein's prescription practices jeopardized patient safety and were fraudulent. (Troendle Dep. at 112-115; McGowan 5/23/12 Dep. at 69, 70, 126, 129; McGowan 5/23/12 Dep. Ex. 26). Dr. McGowan asked why she should apologize for telling the truth. (McGowan 5/23/12 Dep. at 93). Dr. McGowan also told Dr. Troendle that she had confirmed her concerns with the Ohio Board of Pharmacy. (McGowan 5/23/12 Dep. Ex. 26; McGowan 5/23/12 Dep. at 52, 69, 70, 126; Troendle Dep. at 84).

Dr. Troendle fired Dr. McGowan the next day. (McGowan 5/23/12 Dep. Ex. 27; McGowan 5/23/12 Dep. at 127-128).

In addition to Plaintiff's nephew, Dr. Stein subsequently heard that Dr. McGowan had made the statements which he claims were defamatory not only from Medpace staff, but also from a Medpace Board member and Paul Gaffney, the accountant with whom Dr. McGowan consulted as she prepared to purchase Dr. Stein's practice. (Stein 4/30/14 Dep. at 9-10, 12; Stein 9/21/12 Dep. at 137).

Thereafter, on July 11, 2012, Plaintiff Stein filed a Complaint in the Court of Common Pleas, Hamilton County, Ohio, against Dr. McGowan alleging one cause of action for defamation. The matter was removed to this Court, based on diversity jurisdiction. See 28. U.S.C. § 1332. Defendant McGowen now moves for summary judgment.

## II. Analysis

### A. Standard of Review

In a motion for summary judgment, "a court must view the facts and any inferences that can be drawn from those facts ... in the light most favorable to the nonmoving party." *Keweenaw Bay Indian Comm. v. Rising,* 477 F.3d 881, 886 (6th Cir. 2007) (internal quotation marks omitted). "Summary judgment is only appropriate 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'" *Id.* (quoting Fed. R. Civ. P. 56(c)) (internal quotation marks omitted). "Weighing of the evidence or making

credibility determinations are prohibited at summary judgment-rather, all facts must be viewed in the light most favorable to the non-moving party." *Id.*

After a moving party has carried its initial burden of showing that no genuine issues of material fact remain in dispute, the burden shifts to the non-moving party to present specific facts demonstrating a genuine issue for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986). "The 'mere possibility' of a factual dispute is not enough." *Mitchell v. Toledo Hosp.,* 964 F.2d 577, 582 (6th Cir.1992) (citing *Gregg v. Allen-Bradley Co.,* 801 F.2d 859, 863 (6th Cir.1986)). In order to defeat the motion for summary judgment, the non-moving party must present probative evidence that supports its complaint. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249-50 (1986). The non-moving party's evidence "is to be believed, and all *justifiable* inferences are to be drawn in his favor." *Id.* at 255 (emphasis added). The court determines whether the evidence requires submission to a jury or whether one party must prevail as a matter of law because the issue is so one-sided. *Id.* at 251-52.

To demonstrate a genuine issue of fact, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts .... Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" *Matsushita,* 475 U.S. at 587 (citation omitted).

### C. Factual Disputes Preclude Summary Judgment

Defendant McGowan asserts that she is entitled to judgment as a matter of law on Plaintiff's defamation claim because her statements about Dr. Stein's practices were true, and thus not defamatory. Dr. McGowan further asserts that her statements are

protected by qualified privilege because she expressed her concerns only to individuals with whom she had a common interest, and her communication was reasonably calculated to protect or further such common interest.  Her qualified privilege, as well as Dr. Stein's status as a limited-purpose public figure, requires that Dr. Stein prove that Dr. McGowan acted with actual malice when she made her statements.  Dr. McGowan contends that there is no evidence of actual malice.

Dr. Stein, however, contends that Dr. McGowan's statements are not protected by a qualified privilege because her communications were unrelated to any business purpose and/or such statements were directed at persons who had no legitimate reason to be made aware of Dr. Stein's alleged illegal conduct.  Dr. Stein further asserts that even if Dr. McGowan establishes qualified privilege with respect to one or more of her defamatory statements, factual disputes remain related to the issue of actual malice, thereby precluding summary judgment.  The undersigned agrees.

A.  *Applicable Law*

Under Ohio law, the elements of a defamation claim, whether libel or slander, are "(a) a false and defamatory statement concerning another; (b) an unprivileged publication to a third party; (c) fault amounting at least to negligence on the part of the publisher; and (d) either actionability of the statement irrespective of special harm or the existence of special harm caused by the publication." *Harris v Barnhorst*, 513 F.3d 503, 522 (6th Cir. 2008), quoting *Akron- Canton Waste Oil v. Safety-Kleen Oil Servs.*, 611 N.E.2d 955, 962 (Ohio App. 9th Dist. 1992) (Internal quotation marks omitted). "Because the determination of whether words are defamatory is a question of law, summary judgment is appropriate in defamation actions." *Id.*, quoting *Brown v. Lawson*,

169 Ohio App. 3d 430, 2006 Ohio 5897, 863 N.E.2d 215, 219 (Ohio App. 1st Dist. 2006).

"For a statement to be defamatory, it must be a statement of fact and not of opinion." *Brown v. Lawson*, 169 Ohio App.3d 430, 436-437, 863 N.E.2d 215, 220 (2006) (citing *Vail v. The Plain Dealer Publ'g Co.*, 72 Ohio St. 3d 279, 280, 649 N.E.2d 182, 184 (1995)). "To determine whether a statement is fact or opinion, the court applies a totality-of-the circumstances test, considering: (1) the specific language used; (2) whether the statement is verifiable; (3) the general context of the statement; and (4) the broader context in which the statement appears." *Id.* at 437, 863 N.E.2d at 220.

However, not all defamation, even if a defendant publishes statements that could be considered defamatory, is actionable.  Ohio law has held for decades that "a qualified privilege is recognized in many cases where the publisher and the recipient have a common interest, and the communication is of a kind reasonably calculated to protect or further [it]. Frequently, in such cases, there is a legal, as well as a moral, obligation to speak. This is most obvious in the case of those who have entered upon or are considering business dealings with one another." *Hahn v. Kotten*, 43 Ohio St. 2d 237, 244 (1975) (internal citations omitted).

"A publication is privileged when it is "fairly made by a person in the discharge of some public or private duty, whether legal or moral, or in the conduct of his own affairs, in matters where his interest is concerned."" *Taylor Bldg. Corp. of Am. v. Benfield*, 507 F. Supp. 2d 832, 841 (S.D. Ohio 2007) (quoting *Hahn v. Kotten*, 43 Ohio St.2d 237, 243, 331 N.E.2d 713, 718 (1975)). Qualified privilege does not change the actionable quality of the words published, but "merely rebuts the inference of malice that is

13

imputed in the absence of privilege, and makes a showing of falsity and actual malice essential to the right of recovery." *Hahn*, 331 N.E.2d at 718.

B. *Qualified Privilege*

Dr. McGowan first contends that Plaintiff's defamation claim is not actionable under the doctrine of qualified privilege because her statements constituted privileged communication. The essential elements of a privileged communication are: (1) good faith; (2) an interest to be upheld; (3) a statement limited in its scope to this purpose; (4) a proper occasion; and (5) publication in a proper manner to proper parties only. *Hahn*, 331 N.E.2d at 719 (quoting *West v. Peoples Banking & Trust Co.*, 14 Ohio App.2d 69, 236 N.E.2d 679 (1967)). In the context of workplace communications, Ohio courts generally require a defendant to show that she had a legitimate purpose for making the statement to the individuals involved. *See Hanley v. Riverside Methodist Hosp.*, 78 Ohio App.3d 73, 81, 603 N.E.2d 1126, 1131 (1991). Notably, in *Hatton v. Interim Health Care of Columbus*, the 10th District Court of Appeals found that documents outlining the reason for the plaintiff's termination were privileged when created in the scope of employment and "distributed only to those managerial employees who had a need to know the information contained within." 2007-Ohio-1418, ¶ 16 (Ohio App. 2007).

Dr. McGowan asserts that the evidence establishes her entitlement to this qualified privilege because she has established its elements beyond dispute: good faith, an interest to be upheld, a statement limited in its scope to this purpose, a proper occasion, and publication in a proper manner and to proper parties only. *Hahn*, 43 Ohio St. 2d at 244 (internal citations omitted). In support of this contention, Dr. McGowan asserts that Dr. Stein admits that he heard that Dr. McGowan had made the statements

14

which he claims were defamatory only from Medpace staff, a Medpace Board member, and Paul Gaffney, the accountant with whom Dr. McGowan consulted as she prepared to purchase Dr. Stein's practice. (Stein 4/30/14 Dep. at 9- 10, 12; Stein 9/21/12 Dep. at 137). Thus, Dr. McGowan contends that her discussions with Mr. Gaffney about Dr. Steins alleged fraudulent practices related only to the purchase of his business and the liabilities she may assume as a result of that purchase. Dr. McGowan also spoke with her nephew, the CFO for JP Morgan Chase, about her concerns. (McGowan 6/11/14 Dep. at 84-85, 86). Dr. McGowan, however, asserts that this does not impact her privilege defense because the company he worked for, JP Morgan Chase, owned a company which in turn owned a majority share of Medpace. (McGowan 6/11/14 Dep. at 85-85, 86).

As such, Dr. McGowan asserts that it is beyond dispute that she addressed her concern about Dr. Stein's prescription practices only to the proper parties and within the proper context of a workplace meeting to discuss changes in the prescription policies thus satisfying all of the elements to establish qualified privilege.

Upon careful review, the undersigned finds that factual disputes preclude the Court from finding that Dr. McGowan is entitled to qualified privilege. Notably, where the circumstances of the occasion for the alleged defamatory communication are not in dispute, the determination of whether there is a qualified privilege is a question of law for the trial court. *Mauk v. Brundage* (1903), 68 Ohio St. 89, 67 N.E. 152. See also, *Worrell v. Multipress, Inc.* (1989), 45 Ohio St.3d 241, 248, 543 N.E.2d 1277, 1283; *McCartney v. Oblates of St. Francis de Sales*, 80 Ohio App. 3d 345, 355, 609 N.E.2d 216, 223 (1992). However, where the content of the defamatory communication and/or

15

the circumstances under which it is published are unclear under the evidence then the question of whether a qualified privilege exists is one for the jury. See *Theiss v. Scherer* (C.A.6, 1968), 396 F.2d 646, 650.

Here, whether Dr. McGowan's statements were made in good faith, on a proper occasion, to the proper parties and in a proper manner involve questions of fact that cannot be determined on summary judgment. See *McCartney v. Oblates of St. Francis de Sales*, 80 Ohio App. 3d 345, 355, 609 N.E.2d 216, 223 (1992). Notably, Dr. McGowan's contention that her communication was made only to proper parties is disputed. As noted by Dr. Stein, the July 22, 2011 meeting, included the study coordinators (Lindy Bussell, Dessy Dimova, and Melissa Payne), all of whom had no responsibilities with respect to CTC, and even reminded Dr. McGowan of that fact during the meeting. (Bussell 5/9/14 dep. at 10-11; Dimova 4/3/13 dep. at 22-23; Dimova 5/9/14 dep. at 11). Additionally, Ms. Bussell testified that she had no business reason to receive the information about Dr. Stein's alleged fraud. (Bussell 5/9/14 dep. at 28).

Furthermore, Dr. McGowan testified that with respect to the July 22nd meeting, she "had carefully chosen the people that were going to be present at the meeting…I had purposefully not included people from the CPU because they had no need to hear this." (McGowan 6/11/14 dep. at 157). However, the record indicates that Dr. McGowan had in fact made alleged defamatory statements to two CPU employees: Sally Dressman and Vicki Richter. (Dressman dep. at 9-10, 13; Richter dep. at 23). Ms. Dressman testified that she "didn't have any role whatsoever in the MARC/CTC operations," that there are no prescriptions necessary in the CTU operations, that she had absolutely no reason to be concerned about the manner in which Dr. Stein was

writing prescriptions, and that she was not the appropriate person to elevate such a complaint to. (Dressman 4/29/13 dep. at 15, Dresman 5/2/14 dep. at 8, 10-13). Similarly, Ms. Richter testified that Dr. McGowan's conduct had nothing to do with her position or any of her duties relative to MARC. (Richter 5/2/14 dep. at 23-24). It remains dispute whether Dr. McGowan had a legitimate purpose to inform Ms. Dressman and Ms. Richter that Dr. Stein was engaging in fraudulent prescription practices.

Next, a reasonable juror could find that Dr. McGowan's communications with Lee Ann Ernst relating to Dr. Stein's alleged violations of Stark laws are not protected by a qualified privilege. As noted by Plaintiff, Ms. Dressman and Ms. Richter, Ms. Ernst was a CTU employee. (Ernst dep. at 11-12). As such, it would appear that Dr. McGowan had no reasonable purpose in communicating to Ms. Ernst that Dr. Stein's referral of his patients from CTC to MARC was violating federal law.

Likewise, questions of fact remain relating to Dr. McGowan's statements to Joe Bonocore, her nephew and CFO of J.P. Morgan, that Dr. Stein had committed insurance fraud and HIPAA violation. As noted above, Defendant McGowan contends that that this does not impact her privilege defense because the company he worked for, JP Morgan Chase, owned a company which in turn owned a majority share of Medpace, thereby sharing a common interest of preventing illegal or fraudulent activities at Medpace. (McGowan 6/11/14 Dep. at 85-85, 86). However, Dr. McGowan testified that her purpose is contacting Mr. Bonocore was not to protect Medpace and/or stop company fraud, but to save her job. (McGowan Dep. at 90).

A factual dispute also exists with respect to whether Dr. McGowan had a proper purpose for informing the staff about Dr. Stein's alleged HIPAA violations. According to

Dr. McGowan, she put the staff on notice of her perceived problems with the charts so that they would know to handle the charts differently in the future. However, according to several employees who attended the meeting, Dr. McGowan never instructed them to take any action with respect to the charts, but rather simply complained about Dr. Stein's conduct. (Dimova 4/3/13 dep. at 19; Chavarria dep. at 24; Bussell 6/13/13 dep. at 24).

In light of the foregoing and looking at the totality of the circumstances, questions of material fact exist as to whether Dr. McGowan's statements were made in good faith, on a proper occasion, to the proper parties and in a proper manner.  As such, a jury must determine whether Dr. McGowan is entitled to qualified privilege.

Additionally, even if Dr. McGowan establishes qualified privilege with respect to one or more of her defamatory statements, Dr. Stein can still prevail upon a showing of actual malice. *Hanley,* 603 N.E.2d at 1131.  "In a qualified privilege case, "actual malice" is defined as acting with knowledge that the statements are false or acting with reckless disregard as to their truth or falsity." *Jacobs v. Frank*, 60 Ohio St.3d 111, 116, 573 N.E.2d 609, 614 (1991). Thus, "[t]he subjective belief of the speaker must be considered in determining whether a statement was made with actual malice." *Mills Van Lines, Inc. v. Prudential Real Estate & Relocation Servs.*, 2011-Ohio-3833, ¶ 19 (Ohio App. 2011) (citing *Lakota Loc. School Dist. Bd. of Educ. v. Brickner*, 108 Ohio App.3d 637, 649, 671 N.E.2d 578, 586 (1996)).  Significantly, the issue of actual malice is a question for the trier of fact. *Worrell v. Multi Press, Inc.*, 45 Ohio St.3d 241, 249, 543 N.E.2d 1277, 1284 (1989).  Again, such a determination must be made by the jury, as

this determination involves questions of fact that cannot be resolved by the Court on summary judgment.

C. *Elements of Defamation*

Dr. McGowan argues that even if Dr. Stein was a private actor[1] and she is not entitled to privilege, summary judgment should still be granted because Dr. Stein cannot establish three elements of his defamation claim: (1) that Dr. McGowan made a false and defamatory statement about him; (2) that she displayed the requisite degree of fault; and (3) that Dr. Stein was harmed. Again, factual disputes preclude the Court from making such a determination.

With respect to the first element, Dr. McGowan contends that the Ohio Constitution protects Dr. McGowan's comments to her staff about Dr. Stein's prescription practice as a statement of opinion. See *Wampler v. Higgins*, 93 Ohio St. 3d 111, 120 (2001) (holding that the Ohio Constitution protected statement of opinion as non-defamatory speech). 93 Ohio St. 3d 111, 120 (2001) *(internal citations omitted).* For example, an accusation of a crime would constitute an actionable statement, while indefinite or ambiguous statements would in most contexts not constitute an actionable statement. *Id.* at 128. Furthermore, whether the statements are objectively capable of proof or disproof, i.e. whether a statement can be actually verified establishes that the statement is one of fact and not opinion. See *Murray v. HuffingtonPost.com, Inc.*, No.

---

[1] Dr. McGowan also contends that Dr. Stein cannot establish defamation because he was a limited purpose public figure. A limited-purpose public figure is one who becomes a public figure for a specific range of issues by being drawn into or voluntarily injecting himself into a specific public controversy. *Id.* citing *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 351 (1974). If Dr. Stein is a limited public figure, he must demonstrate "actual malice" on the part of Dr. McGowan in publishing her alleged false statements. *Id.* citing *New York Times Co. v.* Sullivan, 376 U.S. 254, 279-280 (1964). However, Dr. McGowan's assertion that Dr. Stein in a limited purpose public figure is not well-taken. Dr. McGowan has neither alleged nor shown that Dr. Stein participated in any public controversy.

2:13-CV-1066, 2014 WL 1884319 (S.D. Ohio May 12, 2014)(citing *Bentkowski,* 637 F.3d at 694; Wampler).

Here, the undersigned finds that a reasonable juror could find that Dr. McGowan's statements were actionable statements of fact.  As noted by Plaintiff, With respect to the specific language used, a viewer is placed on notice by objective, cautionary terms, or "language of apparency," that what is being said is the opinion of the speaker. Terms such as "in my opinion" or "I think" are highly suggestive of opinion. See *Fuchs v. Scripps Howard Broad. Co.*, 170 Ohio App. 3d 679, 695, 868 N.E.2d 1024, 1036 (2006).  Plaintiff contends that Dr. McGowan used no such language.  As outlined by Dr. Stein, Dr. McGowan's deposition testimony shows that she repeatedly characterized the statements she made to Medpace staff and Mr. Bonocore as indisputable fact:

> Q: Why did you feel it was necessary in front of staff members to describe or suggest that the practice Dr. Stein had been engaging in was insurance fraud?
>
> A: I could think of no other way to describe it, other than what it was. (McGowan 5/23/12 dep. at 53).
> ---
> A: What I mean by that was I was asked to write prescriptions for inappropriate amounts. I was asked to write a prescription, for example, for twice the amount of medication a patient was supposed to be taking. And I correctly said that was insurance fraud and that I would not do it. I also noted multiple HIPAA violations. (McGowan 5/23/12 dep. at 9).
> ---
> A: I did not need to ask [attorney] Kate Hanna a question about the legal or illegal nature of this matter. It was insurance fraud. (McGowan 6/11/14 dep. at 30).
> ---
> Q: But you had no doubt that there was violation of Stark laws?

A: I wouldn't say I had no doubt. I had absolutely no doubt that there was insurance fraud. I had absolutely no doubt there were HIPAA violations. (McGowan 6/11/14 dep. at 75).

Q: Is it true that up to July 22nd you hadn't made any efforts to investigate any of these [insurance fraud and HIPAA violation] matters?

A: There would be no need for me to investigate something that I knew to be a fact. (McGowan 6/11/14 dep. at 104)

.

Next, Dr. McGowan's statements relating to Dr. Stein's alleged insurance fraud, HIPAA violations, and alleged violations of Stark laws, are amenable to verification. In fact, Dr. McGowan did contact the Ohio Board of Pharmacy regarding Dr. Stein's prescription practices. Such evidence clearly establishes that a reasonable juror could find that those statements were not statements of opinion.

Next, Dr. McGowan asserts that the statements are not defamatory because she has established the truth of the matter charged as defamatory. Dr. McGowan confirmed with the Ohio Board of Pharmacy that the objectionable prescription practice constituted insurance fraud. Contrary to this assertion, the truthfulness of Dr. McGowan's statements must also be decided by the jury. As noted by Plaintiff, there is substantial evidence in the record challenging Dr. McGowan's assertion that Dr. Stein committed insurance fraud.

Notably, it is undisputed that Dr. McGowan was the only person in Dr. Stein's lengthy medical career to assert that his prescription writing practices were fraudulent. Based on this evidence, a juror could reason that Dr. Stein's actions were not inappropriate in any way, much less fraudulent. Next, Dr. Webb offered substantial testimony that Dr. Stein's prescription practices were in line with professional guidelines

and regulations. (Doc. 46, Affidavit of Cheryle Webb, attached as Exhibit B). She explained that it was not unusual or unexpected for a physician to write a prescription for a specific dosage of medication and then reflect on the patient's chart that he or she had been orally advised to split the pills in half. (*Id.* at ¶ 7). She further stated that Dr. Stein's prescription practices were totally consistent with good clinical practice. (*Id.* at ¶ 9). Additionally, Dr. Troendle offered testimony that prescribing a different dose than a patient takes is not fraud and that his own insurance company sent him a pill splitter and encouraged him to do the same. (Troendle dep. at 66). Finally, Melissa Payne, one of the two Medical Assistants for CTC/MARC, testified that Dr. Turner, the new Director, also writes prescriptions in the same manner as Dr. Stein. (Payne dep. at 24). Thus, at a minimum, genuine issues of fact exist with respect to the issue of whether Dr. Stein was committing insurance fraud by orally directing his patients to split their pills.

Last, Dr. McGowan argues that Plaintiff cannot establish the last two elements of his defamation claim *i.e.* fault and harm. In this regard Dr. McGowan contends that Dr. Stein could not identify any jobs that he lost because of Dr. McGowan's statement or any consulting relationships he lost because of Dr. McGowan's statements. (Stein 4/30/14 Dep. at 35-36). Dr. Stein, however, contends that he need not establish actual malice or harm because Dr. McGowan's statements were defamatory per se, meaning defamatory on its face. *Williams v. Gannett Satellite Info. Network, Inc.*, 162 Ohio App.3d 596, 599, 834 N.E.2d 397, 399 (2005). Unless a privilege applies, damages and fault are generally presumed to exist if a statement is defamatory *per se. Sullins v. Raycom Media, Inc.*, 2013-Ohio-3530, 996 N.E.2d 553, 561-562 (citing *Wampler v. Higgins*, 93 Ohio St.3d 111, 127, 752 N.E.2d 962 (2001)).

"In order to be considered defamatory per se, the words used in the statement must fall in one of three categories: (1) the imputation of a charge of an indictable offense involving moral turpitude or infamous punishment, (2) the imputation of some offensive or contagious diseases calculated to deprive the person of society, or (3) having the tendency to injure the plaintiff in his trade or occupation." *Williams*, 996 N.E.2d at 599 (citing *Schoedler v. Motometer Gauge & Equip. Corp.*, 11 O.O. 487, 15 N.E.2d 958, 959 (1938).

Dr. Stein contends that a reasonable juror could find that Dr. McGowan's statements about Dr. Stein's prescription, chart keeping, and referral practices "tended to injure him in his trade or occupation" and thus be defamatory per se.    The undersigned agrees.  As such, summary judgment with respect to Plaintiff's defamation claim is not well taken.

### III.  Conclusion

In light of the foregoing, it is **ORDERED** that Defendant's motion for summary judgment (Doc. 17) is herein **DENIED**.  Accordingly, this matter shall proceed to trial as scheduled.

*s/Stephanie K. Bowman*
Stephanie K. Bowman
United States Magistrate Judge